## FOUNTAIN RICE v. R. H. JOHNSON ET AL.

Husband and Wife—Separate Property—Chattels—Equitable Doctrine—Fraud on Creditors.

> The separate property of the wife would by law vest in the husband, yet if he does not so regard it, but recognizes it as belonging to the wife exclusively, such property would not vest in him, this however not to be made the instrument of defrauding creditors.

Same.

> Shortly after marriage, the husband being unable to provide for himself and wife, his father-in-law furnished the wife with the necessities to start them to house keeping, in addition to presenting her with cows, a horse and negro servant. This was afterwards sold by the hus-

band, the proceeds from which was paid toward the purchase of a house and lot. The balance of $1500, was paid by the father-in-law with the understanding that the property was to be secured for his daughters use; but the deed was made to the husband. Held, that this would not effect the wifes interest in so-far as to subject the property to the individual debts of her husband, except as beyond her equity.

APPEAL FROM MADISON CIRCUIT COURT.

January 16, 1868.

RESPONSE BY JUDGE WILLIAMS:

(See original opinion, this volume.)

It would at all times be agreeable to this court to review the arguments and points made by counsel, if public duties and circumstances would permit, but these do not; such review and responses are physically impossible compatible with the discharge of our already onerous official labor, therefore, counsel should neither suppose that their points have not been duly considered nor slightly regarded, after considering the evidence and issues, the court writes its impressions, generally without reviewing or responding to either side, and a petition for a rehearing based upon the erroneous presumption that the facts and points have not been seriously considered only adds largely to our already vast labor.

In this case the appellant sought to subject the house and lot in controversy to the payment of his judgment debt, which he had unsuccessfully attempted to collect by execution. Caperton as trustee for Mrs. Johnson held the legal title, and the real question is as to its liability, for whatever claim and equity she had was fully known to appellant when he filed his petition, and not having enjoined Walker, the vendor, from conveying the legal title, the cause must be determined on the equities.

In the original petition it is charged that Johnson paid Walker, the original owner, $500. This is denied in the answer and unsustained by proof. In an amended petition it is charged that Brady bought the lot by title bond from Walker at $1,500, and that he sold to Johnson at $2,000, and that Johnson paid him $500. This is denied in an answer to it, and the written endorsement on the bond, signed by Brady and Johnson is referred to as containing the stipulations of their trade.

The endorsement only shows that Johnson was to pay the accrued rent of $150 for the year 1860, and was to pay the rent of the present year, and in all other things comply with Brady's undertaking with Walker, possession was to be given Johnson February, 1861. The written memorial of the contract between Walker and Brady is dated March 8, 1860, and stipulates that Walker sold to Brady the lot at $1,500 to be paid January, 1864; and was to pay on January 1, 1861, $150 as rents, and the sum annually until the principal was due.

In Latimer vs. ———— 1 Bush, this court had occasion to very fully explore and review the equitable doctrine as to separate property in chattles, &c., which would by law vest in the husband, but which he all the time treated as her individual and separate property, and the authorities are very abundant to the point that although these would by law vest in the husband, yet if he does not regard them as his property, but recognizes them as his wife's, they do not vest in him, of course, however, this is not to be made the instrument of defrauding creditors.

In this case when Johnson and wife went to housekeeping, soon after the marriage, he having nothing, her father furnished her house with necessary furniture, gave her two milch cows, a horse, negro servants, &c., none of which was subject to his execution creditors, so far as appears in this record.

When they broke up housekeeping, previous to the purchase of this house and lot, he seems to have sold a part of this property, and hired out her servant, but this only appears in Judge Goodloe's deposition and from the same it is plainly inferable that Johnson recognized the money as hers, so whether he paid $150 as he alleges, or none as Brady asserts, it was likely paid out of this means, for he had but recently purchased but a small stock of groceries, and that upon the credit of his brother-in-law, Barrett, as he seems to have had neither money nor credit. He could then very properly respond to his wife's importunity to purchase the house, that he was not able and could not spare the money out of his business, when she replied to use her money.

So poor was Johnson, that though his father-in-law aided much in his family's support, he failed to pay the annual rent, when Walker becoming impatient, was threatening to sue and did actually sue, and Mrs. Johnson applied to her father to pay for the house and lot for her; on inquiry he found about $400 of rent was

in arrears, besides the principal—$1,500. He then told her this was more than the property was worth and he would not pay it, but preferred purchasing her a house and lot in Lexington.

Johnson, however, managed to pay the rent, and her father paid in the spring of 1864 to Walker, $250, and September 20, 1865, $1,370, making $1,620, the principal and interest and probably accrued costs, to Walker, with the understanding that the title was to be secured for his daughter's use.

Walker had probably brought suit before this $250 was paid, it had been understood that if her father paid the purchase price the property was to be for her use, he would hardly under the circumstances pay for it to be the property of his insolvent and improvident son-in-law.

Her father had doubtless determined to pay for this property and secure it to her when he made the first payment in the spring of 1864, he fixed the period in 1863, but he is probably mistaken as to a year. No witness says it had then largely enhanced in value, nor indeed do we infer the enhancement was of much significance until the surrender of the rebellion in 1865. If it had really so enhanced, why did appellant remain so quiescent with his judgment and return of *nulla bona?*. He could have secured his debt and obtained a *lis pendens* unencumbered with Mrs. Johnson's equity up to the payment of the purchase price by her father. His conduct is anomolous and unaccountable, but he seemed to have been aroused with a fierce zeal so soon as he was informed of this payment, for which he seems to have been watching with anxious care. As to the small sums laid out for improvements by Johnson, the opinion is sufficiently explicit.

On the whole we conclude that neither law nor justice requires that she shall be disturbed in her beneficial right to this property, hence overrule the petition for a rehearing.

*Turner, for appellant.*

*Burnam, for appellees.*